FILED
SEP 1 0 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


MABEL NORDGREN,                                          Civ. No. 09-91-AC

                    Plaintiff,                          OPINION AND
                                                        ORDER

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                    Defendant.

_____

ACOSTA, Magistrate Judge:

        Claimant Mabel Nordgren ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("SSA") and for Supplemental Security

Income ("SSI") disability benefits under Title XVI of the SSA.  *See* 42 U.S.C. §§ 401-433 and

OPINION AND ORDER                            1                            {KPR}

§§ 1381-83f (2010). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, the court remands the decision of the Commissioner for an award of benefits.

*Procedural History*

Claimant filed for DIB and SSI benefits on September 27, 2005, alleging a disability onset date of January 1, 2004. The claim was denied initially and on reconsideration. On April 23, 2008, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on October 19, 2007, finding Claimant not disabled. Claimant requested review of this decision on May 30, 2008. The Appeals Council denied this request making the ALJ's decision the Commissioner's final decision. Claimant filed for review of the final decision in this court on January 22, 2009.

*Factual Background*

In 1997, Claimant underwent a psychological evaluation by Dr. Gary Sacks ("Dr. Sacks"). Dr. Sacks observed that Claimant worked hard to complete tasks before her, but tended to "dawdle and murmur while thinking though a problem," and took a longer time than is usual. (Tr. 249.) Her intellectual and cognitive functioning were both in the low average range. Claimant reported to Dr. Sacks that she had been fired repeatedly for being slow and, when working at St. Vincent's, was told to complete a work skills course prior to resuming her employment. (Tr. 250.) Dr. Sacks also observed:

> Ms. Nordgren's slowed thinking speed was evidence in her WAIS-R performance. She tended to stammer and mumble while pondering her answers. Her behavior gave the appearance that she was wasting time, when, in reality, I believe she was thinking slowly. When encouraged to work within established time limits, she became irritable and defensive.

(Tr. 252.) As to Claimant's future in the work force, Dr. Sacks concluded that the slowness of

Claimant's thinking would be "difficult to change[,]" and accommodation of this condition would require a job that is "simple, repetitive, easily learned, and can be completed with the hands." (Tr. 255.) Claimant would need to "overlearn her job," possibly with the help of a job coach and an "understanding employer." (Tr. 255.)

On August 4, 1997, Claimant underwent a psychiatric evaluation with Kim Delaney, PMHNP ("Delaney"). Regarding Claimant's potential for employment, Delaney concluded: "Given that 92-95% of her peers outperform her, seeking adequate employment will not be easy." (Tr. 269.) Delaney also speculated that her slowness may lead people to think she is unmotivated or lazy, though she is not.

In 1998, Claimant was referred to Davis Clowers, a PMHNP, for a psychiatric evaluation. She was diagnosed with dysthymic and anxiety disorders, prescribed Zoloft, and assessed as having a GAF of 60. (Tr. 266.)

In 1999, Claimant complained of depression and anxiety, characterized by periods of great fatigue and a lack of motivation and energy. (Tr. 258.)

On April 11, 2001, Claimant was evaluated by Linda Tillery, PMHNP ("Tillery"). She complained of feelings of depression and reported that she "had difficulty keeping jobs due to her inability [to] perform up to expectations and inability to take constructive criticism. She report[ed] increased anxiety if the job coach watches her work and takes any suggestion as criticism." (Tr. 293.) Tillery also agreed with Dr. Sacks's 1997 evaluation of Claimant's emotional functioning.

On October 4, 2005, Claimant was evaluated for behavioral health at Cascadia Behavioral Healthcare. Claimant reported generally that she had feelings of depression and isolation. The evaluator, C. Laborde LPC, CADCI, referred her to at least weekly sessions of group and individual

therapy. (Tr. 286-88.) Claimant was interviewed in October 2005 by the SSA to complete the Disability Report. The interviewer observed: "Her employment seemed sporadic and lasted very short time periods. She generally worked at several different jobs each year. She said that it was because she would give up because she was always being told that she was slow and couldn't do her job right." (Tr. 154.)

On November 5, 2002, Claimant reported to Dr. James H. Buxman ("Dr. Buxman") that her right hand was swollen and in pain. (Tr. 314.) On April 9, 2003, Claimant complained of "recurrent episodes of swelling in her hand[,]" and requested a prescription for Naprosyn, which she had used previously. (Tr. 311.) A few weeks later, Claimant's hand pain and swelling had improved somewhat on Naprosyn, and Dr. Buxman prescribed Prednisone. He wrote: "I am going to place her on light duty[.]" (Tr. 342.) On April 24, 2003, Claimant saw Dr. Buxman for a follow up and after a course of Prednisone "the redness and swelling [had] disappeared." (Tr. 341.) Claimant was later diagnosed with "overuse syndrome and tendinitis of the right hand[.]" (Tr. 340.) She was prescribed an anti-inflammatory which was effective, though there was residual swelling. However, Claimant maintained a "good range of motion." (Tr. 340.)

On August 5, 2005, Claimant was seen by Dr. Buxman and reported side effects from the medication Zoloft which prompted Dr. Buxman to reduce her dosage. (Tr. 303) On November 10, 2005, Claimant complained of pain in her elbow which had been bothering her for approximately one month. Dr. Mindy Loebner ordered an x-ray to see if the pain was caused by arthritis. (Tr. 301-2.) Claimant was evaluated the following day by Dr. Linda L. Jensen, who characterized Claimant's impairments, specifically depression and chronic fatigue, as non-severe and characterized Claimant's allegations as partially credible. (Tr. 348.)

OPINION AND ORDER                              4                              {KPR}

Later that month, on November 29, 2005, Claimant was evaluated by Dr. Molly McKenna ("Dr. McKenna"), the purpose of which was to "assess the nature, severity, duration, and limiting effects of the client's impairments and determine whether there are any mental, cognitive, or emotional difficulties which would interfere with the client's ability to be gainfully employed." (Tr. 349.) Dr. McKenna described Claimant as mildly depressed, a condition exacerbated by her social isolation, as well as exhibiting characteristics "consistent with schizoid personality disorder." (Tr. 352.) However, Dr. McKenna attributed Claimant's difficulties at work to "her limited reasoning ability, slow pace, poor academic achievement skills, and tendency toward defensiveness when provided with feedback about her work performance." (Tr. 352-53.) Even so, Dr. McKenna found Claimant to be highly motivated to return to work, working to improve her marketable skills, and in agreement with Dr. McKenna that doing so would improve her mental state. (Tr. 353.)

Ultimately, Dr. McKenna concluded that employment would be beneficial for Claimant, but would also be difficult to find and maintain. Dr. McKenna wrote:

> She is most likely to succeed in limited, repetitive, overlearned positions without much time pressure. However, her difficulties with employment have been moderately long-standing, and may be unlikely to improve. . . . The primary barriers to returning Ms. Nordgren to full-time sustained employment appear to be her slow pace, limited academic skills, poor response to feedback about job performance, fatigue, and limited insight. . . . She has poor calculation skills, but good concentration, attention, and persistence.

(Tr. 353.) Dr. McKenna repeatedly couches her observations as contingent on *if* Claimant is able to obtain employment and acknowledges the possibility that Claimant may "be found eligible for disability benefits." (Tr. 353.)

On December 7, 2005, Dr. Paul Rethinger filled out a "Psychiatric Review Technique" for the SSA. He assessed Claimant's functional limitations pursuant to the B Criteria as follows:

restriction of activities of daily living, none; difficulties in maintaining social functioning, mild; difficulties in maintaining concentration, persistence, or pace, moderate; and episodes of decompensation, each of extended duration, none. (Tr. 366.) Dr. Rethinger also concluded that Claimant's impairments did not satisfy the C Criteria. (Tr. 367.)

Claimant was again evaluated for a "Mental Residual Functional Capacity Assessment," which characterized Claimant as moderately limited in terms of "[t]he ability to understand and remember detailed instructions[,]" and "the ability to carry out detailed instructions[.]" (Tr. 370.) In conclusion, the assessor wrote: "[Claimant] would work best in environments that only require simple (1-2 step) instructions and would not require her to remember, understand or follow detailed instructions." (Tr. 372.)

Claimant underwent a work evaluation prepared by Donna Smith, Vocational Services Coordinator. Smith wrote: "Mabel has a sincere desire to work, and will probably do well in a supported work environment, or even a sheltered work place. Competitive community employment will be very difficult for her, not only because of her lack of speed, but she needs ongoing support[]." (Tr. 231.) Smith went on to say that competitive employment may be possible so long as the pace is slow and Claimant receives substantial training.

On March 31, 2006, Claimant told Dr. Buxman that she wanted to apply for disability based on "mental slowness." (Tr. 418.) Dr. Buxman wrote: "she does seem quite slow but not to a degree that one would call mental retardation." (Tr. 418.)

On April 12, 2006, Claimant completed an Individualized Plan for Employment with the Office of Vocational Rehabilitation Services. The counselor wrote, in relevant part: "Mabel has had difficulty with competitive employment and will do best with some level of supported employment."

(Tr. 210.)

In 2007, Claimant saw Dr. Buxman for "obesity and hyperlipidemia." (Tr. 395.) Dr. Buxman felt that Claimant was making light of her condition and not motivated to change her diet, which at the time consisted primarily of fast foods. However, by December of that year, Claimant was "doing exercising and losing weight." (Tr. 402.)

Elizabeth Gonzalez, an Employment Specialist, performed Claimant's annual review, entitled "Competitive Employment Evaluation," and wrote that Claimant would require "[s]pecialized job placement tailored to the vocation limitation of [her] disability," which was characterized as a "support[] not normally provided in typical community employment." (Tr. 135.)

Only July 15, 2007, Claimant was diagnosed with "overuse tendinitis" in her right arm and elbow due to repetitive use. (Tr. 392.) On November 13, 2007, Claimant again visited Dr. Buxman because of pain in her right arm. (Tr. 389.) Dr. Buxman found her arm "swollen and very tender[,]" and recommended that she stay "off work 1 month." (Tr. 389.) On December 27, 2007, Dr. Buxman wrote a note for Claimant that read: "Ms. Nordgren called the office to report that her arm is still too painful and therefore cannot return to work." (Tr. 446.) Dr. Buxman wrote another note on April 8, 2008, stating: "Mabel is slowing down on her household work due to ongoing problems with tendinitis." (Tr. 447.)

Claimant testified at the administrative hearing, held on April 23, 2008. She stated that she lost her job at St. Vincent de Paul[1] because of her tendinitis. (Tr. 25.) Prior to that job, Claimant believes she worked in food service and testified that she left because she wanted a change. The ALJ

---

[1] Claimant referred to "Dupaul" in her hearing testimony. St. Vincent de Paul is apparently a sheltered workshop.

suggested that she wanted a "career change" and Claimant agreed. (Tr. 26.) Claimant testified that she was let go from most of her previous jobs due to slowness. She stated that this was a permanent condition and "something [that she had] to live with." (Tr. 27.) She expressed difficulty with math and with writing things down on the job. Claimant testified that she worked briefly at Burger King but was let go because she was "too slow." (Tr. 29.) She stated that she began to suffer from tendinitis approximately one year prior to the hearing and that her doctor had recommended she take Tylenol and wrote a note to excuse her from working. (Tr. 30.)

Next, Cynthia Hanna testified. She is a case manager with People Helping People and "work[s] with [Claimant] as a case manager and advocate, and [] was contracted by Vocational Rehabilitation to help her[.]" (Tr. 34.) She described working with Claimant to help her perform everyday tasks: "She gets confused easily, she's very slow, it's difficult for her to understand things, and I've had to use a lot of repetition as well as actually sitting down with her and being present physically to help her with paperwork, with processes, with understanding." (Tr. 35.) With regard to placing Claimant in the work force, Hanna felt that it would be "extremely difficult . . . because of her inability to understand her slowness and how easily she gets confused." (Tr. 36.) Hanna reported that Claimant's nervousness and anxiety can be triggered even under conditions that are not stressful.

*Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.     Steps One and Two

OPINION AND ORDER                           8                          {KPR}

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the onset of her alleged disability. (Tr. 14.) At Step Two, the ALJ determined that Claimant had the following severe impairments:  borderline intellectual functioning, affective disorder, personality disorder, and right wrist tendonitis. (Tr. 14.) The ALJ's specific findings as to each impairment are detailed below.

A.    *Mental Disorders*

Claimant's medical impairments include affective disorder, personality disorder, and borderline intellectual functioning. The ALJ relied on the findings of Dr. Crossen, the independent medical expert, who testified that Claimant's mental problems do not restrict her activities of daily living; pose moderate limitations in maintaining social functioning, and maintaining concentration, persistence, and pace; and do not result in episodes of decompensation. The ALJ concluded that Claimant "is not one who either has a complete inability to function outside the area of her home or is likely to decompensate from a minimal increase in mental demands." (Tr. 15.) According to Dr. Crossen, Claimant's personality disorder "is demonstrated by some symptoms of seclusiveness or autistic thinking, as well as a mood disturbance," but does not create a degree of functional limitation that would qualify Claimant as disabled. (Tr. 15.)

The ALJ characterized Dr. McKenna's conclusions as follows:  Claimant's mental health symptoms were mild; returning to work would be the best treatment; and Claimant's problems were likely caused by unemployment, rather than the cause of her unemployment.

In 2005, Claimant was evaluated by her treating therapist who concluded that her symptoms were mild to moderate and gave her a GAF score of 55. The ALJ considered this report consistent with "consulting assessments to the extent psychologists consistently cite[d] how independent

[Claimant was], from living alone, to supporting herself [from] age 18, to managing public transit."
(Tr. 17-18.)

In evaluating Claimant, the ALJ described her recent work history. At hearing, Claimant testified that she stopped working in 2004 because she wanted a career change. On a January 2007 job application, Claimant wrote that since September 2004 she had worked for a temporary agency on an on-call basis "doing production work." (Tr. 17.) She worked at DePaul Industries from January to September 2007 as a "screener[.]" The ALJ observed that Claimant had performed semi-skilled work for several years. He also observed that Claimant's condition, characterized as her being "slow," is a life-long condition that had not prevented her from working in the past. The ALJ wrote: "Finally, one has to wonder if the claimant was easily confused, a slow worker, and had difficulty with people, then how did she maintain a relationship with the same temporary help placement firm for three years." (Tr. 17.)

B.    *Tendinitis*

In April 2003, Claimant began to complain of hand pain. The ALJ cited medical evidence that Claimant's hand pain was managed with medication; that x-rays and test results were generally normal; and that Claimant was capable of performing light work. Claimant was diagnosed with "overuse tendonitis." (Tr. 17.)

In September 2007, Claimant was diagnosed with tendonitis. The diagnosis was made by a treating physician, Dr. Buxman, and is memorialized in a single line: "Off work for one month due to your medical condition[.]" (Tr. 15.) The diagnosis was not confirmed by neurological testing. The ALJ concluded that Dr. Buxman's diagnosis was inadequate and vague and, further, noted that the Dr. Buxman "believe[d] the duration of the impairment [was] for one month rather than one

year." (Tr. 15.) Thus, the impairment did not satisfy the durational requirement that the impairment last or be expected to last for at least twelve months. Claimant testified that "she cannot work because of right arm tendonitis, periodic stiffness in her legs," and an inability to maintain an adequate physical pace at work. (Tr. 16.)

The ALJ noted that Claimant once "told the provider at Cascadia that she had no physical handicap." (Tr. 17.)

II.    Step Three

At Step Three, the ALJ determined that Claimant's impairments do not meet or medically equal a listing as set forth in the regulations, specifically Listing 12.02, Organic Mental Disorders; Listing 12.04, Affective Disorders; and Listing 12.08, Personality Disorders. The ALJ found that Claimant satisfied the A criteria for each of the three listings and went on to evaluate the "degree of functional loss resulting from these impairments," using the method described in the regulations. (Tr. 15.) The ALJ went on to describe the factors and analysis associated with the B and C Criteria.

III.    Claimant's RFC

The ALJ concluded that Claimant has the RFC "to perform light work as defined in [the regulations] involving simple, repetitive, routine tasks with only occasional public interaction and occasional use of basic math and writing skills." (Tr. 16.)

IV.    Step Four

At Step Four, the ALJ concluded that Claimant could not perform past relevant work because it was semi-skilled and Claimant was currently capable only of unskilled work.

V.    Step Five

At Step Five, the ALJ concluded that Claimant was capable of performing other work that

exists in substantial numbers in the national economy. The ALJ concluded that Claimant could

perform some, but not all, light unskilled work. The VE stated, in response to the ALJ's hypothetical

that Claimant was capable of acting as a small products assembler, a cleaner or polisher, or a small

product inspector. Each of these jobs are available both regionally and nationally.

### Discussion

Claimant objects to the ALJ's conclusions on five grounds: (1) the ALJ failed to consider

the opinion of an examining physician; (2) the ALJ's Step 2 findings were incomplete; (3) the

Vocational Expert did not testify that her conclusions were consistent with the Dictionary of

Occupational Titles; (4) the ALJ improperly rejected lay witness testimony; and (5) the ALJ

improperly evaluated Claimant's RFC. The court will address each objection in turn.

I.      Examining Physician

Claimant argues that the ALJ erroneously ignored the conclusions of Dr. Sacks. Dr. Sacks

evaluated Claimant in 1997, with the specific purpose of assessing Claimant's eligibility for benefits.

Claimant contends that the ALJ failed to consider or address Dr. Sacks's opinion and, thus,

committed reversible error. The Commissioner responds that, subsequent to this evaluation,

Claimant continued to work in food service for eight years. Furthermore, the Commissioner argues

that the ALJ properly relied on the opinions of two other physicians, Drs. McKenna and Crossen.

According to the Commissioner, Dr. McKenna examined Claimant more recently than Dr. Sacks and

concluded that Claimant's condition was likely exacerbated by unemployment, rather than being the

cause of her unemployment. In reaching her conclusion, Dr. McKenna reviewed Dr. Sacks's

evaluation. Dr. Crossen, a non-examining physician, reviewed Claimant's file and, in doing so, also

took into account Dr. Sacks's evaluation. Thus, because these evaluations took place after Dr.

Sacks's evaluation and took Dr. Sacks's evaluation into account, it was not error for the ALJ to ignore Dr. Sacks's conclusions. Furthermore, the Commissioner argues, the ALJ did reference Dr. Sacks's report and thus the court can infer that it was taken into consideration. Claimant replies that the Commissioner is making impermissible "post-hoc" arguments to justify the ALJ overlooking Dr. Sacks's evaluation.

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Commissioner Social Security Administration*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The conclusions of examining physicians are given greater weight than those of non-examining physicians. *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990). Where the examining physician's opinion is not contradicted, "the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Lester*, 81 F.3d at 830 (quoting *Pitzer*, 908 F.2d at 506).

Furthermore, the Ninth Circuit has held that, in reviewing disability determinations, it "'cannot rely on independent findings of the district court.' Rather, '[it is] constrained to review the reasons the ALJ asserts.'" *Stout v. Commissioner, Social Security Administration*, 454 F.3d 1050, 1054 (9th Cir. 2006) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). And, as it had previously stated: "if the Commissioner's contention invites this [c]ourt to affirm the denial of benefits on a ground not invoked by the Commissioner in denying the benefits originally, then we must decline." *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001).

In his disposition, the ALJ noted that Dr. Crossen "had the opportunity to review the claimant's medical treatment, consulting, and reviewing psychologist opinions." (Tr. 15 (citing

Exhibits 1F-13F).)  The Commissioner argues that in citing Dr. Sacks's evaluation, Exhibit 1F, the ALJ demonstrated that he "considered Dr. Sacks'[s] report."  (Defendant's Brief 8.)  The court disagrees.  In referring to a large swath of the administrative record, the ALJ demonstrated only that Dr. Crossen considered Dr. Sacks's evaluation.  This is insufficient to establish that the ALJ considered Dr. Sacks's evaluation.  Furthermore, because Dr. Sacks was an examining physician, the ALJ was obligated to give clear and convincing for rejecting this opinion.  In not referencing this opinion at all, the ALJ committed clear error.

The court is also unpersuaded that it should adopt the Commissioner's reasoning that, because Claimant worked for several years following the evaluation, its content is irrelevant to Claimant's disability determination.  As above, the court must evaluate the ALJ's opinion in light of the evidentiary record as a whole.  Where the ALJ fails to even mention relevant evidence, here the opinion of an examining physician, to argue that its omission was harmless is an impermissible post-hoc rationalization and does not obviate the ALJ's error.

II.    Step 2 Findings

Claimant argues that the ALJ erred in ignoring Claimant's obesity and anxiety, and their resulting effects.  As to obesity, Claimant argues that outside of acknowledging that Claimant weighed 245 pounds, the ALJ failed to make sufficient findings as to her obesity and its effect on her ability to work.  As to anxiety, Claimant states that her mental health charts contain repeated references to her anxiety and, additionally, Dr. Crossen testified to its effect on her behavior in the workplace.  Claimant seeks a remand for complete findings at Step 2.

The Commissioner argues that, pursuant to Step 2, it is Claimant's burden to establish that an impairment is severe.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The Commissioner

OPINION AND ORDER                          14                              {KPR}

also cites *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005) for the proposition that a claimant must

demonstrate more than symptoms to establish an impairment:

> Regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings. . . . In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process.

*Id.* at 1006 (citing SSR 96-4p, 1996 WL 374187, at *1-2).

Regarding anxiety, the Commissioner argues that Claimant mischaracterizes the record,

namely, Dr. Crossen's comments about her anxiety. The Commissioner is correct that Dr. Crossen's

observations cite Claimant being "nervous" and "anxious" but do not amount to a diagnosis of

clinical anxiety. Furthermore, despite some references to anxiety, the court's review of the record

does not reveal that Claimant suffers from severe anxiety.

The Commissioner further argues that the record does not establish that Claimant's obesity

is a severe impairment for purposes of the disability determination. Claimant has not demonstrated

that obesity, alone or in combination with other impairment, significantly limits her ability to work.

Claimant cites Exhibits 4F, 13F, and 14F. Although Claimant is identified as obese, the court has

again reviewed the cited exhibits and observes that they do not contain indications that her obesity

poses serious physical limitations. Accordingly, Claimant has failed to meet her burden to establish

that anxiety and obesity are severe impairments for purposes of Step 2. The ALJ did not err in

making the Step 2 findings.

III.    VE's Testimony and DOT

Claimant next argues that the ALJ erred when he failed to explicitly question the VE as to

whether her testimony was consistent with the DOT.  Claimant cites *Massachi v. Astrue*, 486 F.3d 1149 (9th Cir. 2007), wherein the Ninth Circuit held that an ALJ has an affirmative duty to question a VE as to whether his or her testimony is consistent with the DOT.  Specifically, "SSR 00-4p unambiguously provides that '[w]hen a [vocational expert] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] . . . evidence and information provided in the [DOT].'"  *Id.* at 1152 (quoting SSR 00-4p, available at 2000 WL 1898704).  According to Claimant, the ALJ did not perform his affirmative duty and, thus, the case should be remanded so that this inquiry can be properly made.

The Commissioner contends that any failure of ALJ to perform his affirmative duty was harmless error.  The Commissioner points out that, under *Massachi*, "[the] procedural error could have been harmless, were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts . . . .  Instead, we have an apparent conflict with no basis for the vocational expert's deviation."  486 F.3d at 1154 n.19.  In subsequent cases, courts have applied this harmless-error analysis where an ALJ failed to inquire as to whether the VE's testimony was consistent with the DOT.  Some courts have taken the position that, where the claimant fails to "identify any potential conflict or deviation by the VE from the information in the DOT[,]" the error is deemed harmless without further inquiry.  *Chand v. Astrue*, No. CIV S-08-0217 DAD, 2009 U.S. Dist. LEXIS 86621, at *46 (E.D. Cal. Sept. 21, 2009).  Other courts have proceeded to investigate the record and the DOT itself to determine if an apparent conflict exists before deciding whether such error was harmless.  *See Stevenson v. Astrue*, CASE NO. 07-CV-0736 W (NLS), 2008 U.S. Dist. LEXIS 63857, at *39-40 (S.D. Cal. Aug. 15, 2008) ("Although Plaintiff

OPINION AND ORDER                              16                              {KPR}

argues that S.S.R. 00-4p required the ALJ to inquire whether Lasoff's testimony conflicted with the DOT, Plaintiff does not argue that Lasoff's testimony did in fact conflict with the DOT. A review of the DOT job descriptions confirms that no such conflict exists."); *Baptista v. Astrue*, No. CV 07-3053-MO, 2008 U.S. Dist. LEXIS 101407, at *27-28 (D. Or. Dec. 2, 2008) (sua sponte determination that, because there were potential conflicts, the ALJ's failure was not harmless error); *Smith v. Astrue*, No. ED CV 08-1890-E, 2009 U.S. Dist. LEXIS 49532, at *6-7 (C.D. Cal. June 12, 2009) (court considers whether "there existed an 'apparent unresolved conflict' between the vocational expert's opinion and the DOT" to determine if the error was harmless).

Here, Claimant fails to identify a specific conflict between the VE's testimony and the DOT. Furthermore, based on its review of the relevant record evidence, the court concludes that there is no apparent conflict between the VE's testimony and the DOT. Thus, the ALJ's procedural error is harmless.

IV.    Lay Witness Testimony

Claimant objects that the ALJ improperly rejected the testimony of her case worker Cynthia Hanna, a lay witness. Specifically, Claimant argues that the ALJ failed to accept or reject the testimony, make a credibility finding, or state how much weight the testimony was given, each failure being reversible error. The Commissioner responds that the ALJ did not reject Hanna's testimony and, in fact, incorporated her observations into Claimant's RFC. The Commissioner argues that, to the extent Hanna's observations were consistent with the medical evidence, they were incorporated, but to the extent they were not consistent, the ALJ had no duty to give reasons to reject her testimony.

It is well established that, "[i]f the ALJ wishes to discount the testimony of the lay witnesses,

he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th

Cir. 1993). It is appropriate to reject the testimony of a lay witness where it is inconsistent with

medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). That said,

> lay witness testimony as to a claimant's symptoms is competent evidence which the
> Commissioner must take into account. Such testimony is competent evidence and
> cannot be disregarded without comment. . . . Disregard of this evidence violates the
> Secretary's regulation that he will consider observations by non-medical sources as
> to how an impairment affects a claimant's ability to work. . . .
>     The ALJ need not discuss lay witness testimony that pertains to whether or
> not an impairment exists. . . . However, once an impairment has been established by
> medical evidence, the extent of the diagnosed impairment may be testified to by the
> lay witnesses.

*Yates v. Astrue*, 1:08cv01466 GSA, 2009 U.S. Dist. LEXIS 113090, 22-23 (E.D. Cal. Nov. 20, 2009)

(internal citations omitted).

The court agrees with the Commissioner that the ALJ did not ignore or reject Hanna's

testimony. The ALJ noted Hanna's observation that Claimant had "difficulty understanding paper

work related to medical treatment or to an alleged work injury," and that her communications with

Claimant required repeated explanations. (Tr. 16.) Further, the ALJ noted Hanna's observation that

Claimant becomes frustrated and "shaky" when she is confused, with contributes to additional

slowness. (Tr. 17.) The ALJ also noted that Hanna's testimony was not that of a qualified social

worker, thus indicating the amount of weight given the testimony. Furthermore, the ALJ gave no

indication that he found Hanna's report not credible.

The record reveals that the ALJ gave proper consideration to the report in question. If

anything, the ALJ did not give Hanna's observations the weight that Claimant believes they deserve.

This is not, however, reversible error as such determinations are clearly within the ALJ's discretion.

V.    Residual Functional Capacity

OPINION AND ORDER                             18                                {KPR}

Claimant argues that the ALJ failed to include the following in formulating her RFC: Claimant would need an accommodation to address her slow work speed; Claimant would need to "overlearn" her job duties; and Claimant would need an understanding employer. Furthermore, Claimant argues, the VE testified that, consistent with Dr. Crossen's diagnosis that Claimant had a moderate limitation in concentration, persistence, and pace, and this would prevent her from competitive employment. According to Claimant, this testimony was accepted by the ALJ, but subsequently ignored and, thus, there is no need to remand the case for further reconsideration.

The Commissioner responds that the impairments in question were accounted for in Claimant's RFC. The ALJ expressed this restriction in the requirement that Claimant be given simple, routine, and repetitive work. The Commissioner cites a recent Ninth Circuit case wherein the court concluded that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). The court cited an Eighth Circuit case wherein that court held that a restriction to "simple, repetitive, routine tasks adequately capture[d] [the claimant's] deficiencies in concentration, persistence or pace." *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001). The Ninth Circuit, citing *Howard*, reached the same conclusion:

> The Eighth Circuit's decision in *Howard* is directly on point. There, the court explicitly rejected a claim that an ALJ's hypothetical describing an ability to do "simple, routine, repetitive work" failed to capture deficiencies in concentration, persistence, or pace. The court noted the state psychologist's findings which concluded that the claimant, despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks. The medical evidence by Dr. Eather in the present case reflects the same conclusion.

*Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (internal citation omitted). The

record in this case presents a somewhat different picture.  In both *Howard* and *Stubbs-Danielson*,
the record showed that the limitation to simple, routine, and repetitive work adequately captured the
claimant's difficulties with pace.  However, on a different factual record, such a limitation may not
be adequate.

Here, the ALJ posed the following hypothetical based on an individual with Claimant's age,
and educational and vocational background:  "Please assume that this worker is limited to simple,
routine repetitive work, and should only occasionally have any interaction with members of the
public.  Should only occasionally be required to be engaged in any basic math or writing
(INAUDIBLE) 20 pounds occasionally, 10 pounds frequently."  (Tr. 41-42.)  However, Claimant
is not only slow in her performance of tasks, she often needs additional guidance to complete them,
and would require an understanding employer to maintain employment.

The evidentiary record is replete with references to Claimant's slowness and difficulty
competing in the normal job market.  Dr. Sacks concluded that Claimant would require a simple and
repetitive job; would need to overlearn her job; and would need an understanding employer.  Delaney
stated that Claimant would have difficulty securing employment because she is outperformed by at
least ninety percent of her peers.  Dr. McKenna, while stating that employment would be beneficial
for Claimant, recognized the difficulty Claimant would have finding and maintaining employment.
A Vocational Services Coordinator stated that, despite a desire for work, competitive employment
would be very difficult for Claimant both due to slowness and a need for ongoing support.  Dr.
Buxman noted that Claimant was quite slow.  A counselor at Vocational Rehabilitation Services
wrote that Claimant would have difficulty with competitive employment and would do best in a
supported employment environment.  Gonzalez, an Employment Specialist, again cited Claimant's

need for specialized job placement and an abnormally supportive environment. Finally, Hanna testified that competitive employment would be extremely difficult for Claimant due both to her slowness and her tendency to get confused. In light of substantial record evidence, the ALJ's hypothetical was simply inadequate to capture Claimant's specific set of limitations.

By contrast, the hypothetical posed by Claimant's counsel at hearing more adequately captures Claimant's actual impairment. That hypothetical referred to Claimant's "moderate deficit in concentration, persistence and pace," and suggested that would pose a twenty to twenty-five percent reduction in productivity from an employer's norm. (Tr. 43.) The VE responded: "I believe unless it was a sympathetic employer, such as a shelter workshop or just, you know, a person that's out of the normal labor market, very sympathetic, it would preclude competitive employment, especially affect[ing] retention." (Tr. 43-44.) Based on the record evidence, the court concludes that Claimant's mental impairments, her slowness in particular, preclude her from competitive employment.

*Remand*

Claimant argues that this hypothetical and the VE's response were not refuted by the ALJ and, because the hypothetical adequately captures Claimant's impairment and would result in a finding of disability, the court should remand for an award of benefits. "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). In *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004), the Ninth Circuit set forth the framework for determining whether a remand for hearing or a remand for benefits is appropriate:

Remand for further administrative proceedings is appropriate if enhancement of the

OPINION AND ORDER                                21                                {KPR}

record would be useful. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.

*Id.* at 594 (citations and emphasis omitted). Evidence rejected by the ALJ should be credited and remand for benefits granted where: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).

As stated above, the court concludes that the record evidence, taken as a whole, demonstrates that Claimant's impairments are disabling. The record has been fully developed and requires no enhancement and, therefore, remand for an award of benefits is appropriate.

### Conclusion

For the reasons stated, the decision of the Commissioner denying Claimant's application is REVERSED and REMANDED for an award of benefits.

DATED this 10th day of September, 2010.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge